Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

**Pro hac vice admission to be sought*

*Counsel for Plaintiff and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**

**FOR NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

ALEX WOODS, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

VERVE GROUP EUROPE GMBH, a German limited liability company,

*Defendant*.

Case No. 5:24-cv-04909-PCP

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TO COMPEL ARBITRATION**

**Hearing Date:** November 19, 2025
**Hearing Time:** 9:00 a.m.
**Judge:** Hon. Noël Wise
**Hearing Location:** San Jose Courthouse, Courtroom 3, 5th Floor

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

STANDARD...........................................................................................................................3

ARGUMENT..........................................................................................................................3

I. PLAINTIFF HAS STANDING TO SUE VERVE. ...........................................................3

A. Plaintiff alleges a concrete injury-in-fact.............................................................4

B. Plaintiff's harms are directly traceable to Verve's SDK. .......................................7

C. Plaintiff has standing to seek injunctive relief. ......................................................7

II. PLAINTIFF DID NOT CONSENT TO VERVE'S CONDUCT. ......................................8

III. PLAINTIFF STATES A VALID CLAIM UNDER CIPA. ............................................10

A. CIPA's pen register prohibition is not limited to law enforcement. ......................10

B. CIPA's pen register prohibition applies to internet technologies, not just telephones ..........................................................................................................................11

C. The pen register statute has no "party" exception. ...............................................12

D. The best reading of CIPA will not undermine internet operations or the California Consumer Privacy Act (CCPA). ..............................................................13

E. The FAC specifically pleads that Woods had his personal information captured by Verve's SDK Tracker. ..........................................................................14

IV. PLAINTIFF STATES A VALID CDAFA CLAIM. .......................................................15

A. Plaintiff adequately alleges that Verve accessed his computer system. ................15

B. Woods alleges that Verve accessed Plaintiff's device "knowingly." ....................17

C. Woods also pleads damages...................................................................................17

V. VERVE'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED...............18

A. This Court—not an arbitrator—decides the question of arbitrability. ...................19

B. Claims against Verve are not "disputes" subject to arbitration under the Tagged TOS. ....................20

C. Verve cannot enforce the Tagged arbitration agreement through equitable estoppel ....................21

1. Traditional elements of equitable estoppel are not met here ....................21

2. Verve involves an arbitration-specific version of equitable estoppel that has been abrogated by the United States Supreme Court ....................22

a. Verve's equitable estoppel standard derives from California intermediate court opinions applying (abrogated) federal law. ....................23

b. *Morgan v. Sundance* has invalidated *Metalclad* and *Goldman*'s arbitration-specific estoppel rule....................25

3. Verve fails to satisfy even the arbitration-specific version of the equitable estoppel. ....................27

a. Plaintiff's claims against Verve do not rely on the Tagged TOS nor are intimately found in and intertwined with it....................27

D. Tagged's Arbitration Agreement and Delegation Clause are Unconscionable. ....31

1. The delegation clause is procedurally unconscionable. ....................32

2. The delegation clause is substantively unconscionable. ....................33

3. The arbitration agreement more generally is procedurally and substantively unconscionable. ....................34

CONCLUSION ....................35

## TABLE OF AUTHORITIES

Page(s)

**United States Supreme Court Cases**

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009) .......... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 3

*Bryan v. United States*,
524 U.S. 184 (1998) .......... 17

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 5, 6

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 19

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
586 U.S. 63 (2019) .......... 20

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 2, 23, 25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 1, 3, 4, 5

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) .......... 18

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989) .......... 25

**United States Court of Appeal Cases**

*ASARCO, LLC v. Union Pac. R.R. Co.*,
765 F.3d 999 (9th Cir. 2014) .......... 3

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 9

*Chalk v. T-Mobile USA, Inc.*,
560 F.3d 1087 (9th Cir. 2009) .......... 31

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 18

*Franklin v. Cmty. Reg'l Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) .......... 23, 24

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) .......... 5

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) .......... *Passim*

*Herrera v. Cathay Pac. Airways Ltd.*,
104 F. 4th 702 (9th Cir. 2024) .......... 22, 23, 25

*Homedics, Inc. v. Valley Forge Ins. Co., a Pa. Corp.*,
315 F.3d 1135 (9th Cir. 2003) .......... 21

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 5, 6

*In re Pac. Fertility Ctr. Litig.*,
814 F. App'x 206 (9th Cir. 2020) .......... 23, 25

*Inland Empire Waterkeeper v. Corona Clay Co.*,
17 F.4th 825 (9th Cir. 2021) .......... 4

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013) .......... *Passim*

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) .......... 32

*McCarthy v. United States*,
850 F.2d 558 (9th Cir. 1988) .......... 3

*MS Dealer Serv. Corp. v. Franklin*,
177 F.3d 942 (11th Cir. 1999) .......... 23

*Murphy v. DirecTV, Inc.*,
724 F.3d 1218 (9th Cir. 2013) .......... 28

*Namisnak v. Uber Techs., Inc.*,
971 F.3d 1088 (9th Cir. 2020) .......... 27, 28

*Pandolfi v. Aviagames, Inc.*,
2025 WL 2463742 (9th Cir. Aug. 27, 2025) .......... 31, 32, 33, 34

*Popa v. Microsoft Corp.*,
2025 WL 2448824 (9th Cir. Aug. 26, 2025) ........ 4, 5

*Rahmany v. T-Mobile USA Inc.*,
717 F. App'x 752 (9th Cir. 2018) ........ 29

*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024) ........ 34, 35

*Rowe v. Edu. Credit Mgmt. Corp.*,
559 F.3d 1028 (9th Cir. 2009) ........ 15

*Scheurer v. Fromm Fam. Foods LLC*,
863 F.3d 748 (7th Cir. 2017) ........ 26

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 1, 3

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*,
10 F.3d 753 (11th Cir.1993) ........ 23

*Thomas v. Papa John's Int'l, Inc.*,
2025 WL 1704437 (9th Cir. June 18, 2025) ........ 12

*United States v. Cano*,
934 F.3d 1002 (9th Cir. 2019) ........ 16

*United States v. Kirilyuk*,
29 F.4th 1128 (9th Cir. 2022) ........ 25

*Warciak v. Subway Rests., Inc.*,
880 F.3d 870 (7th Cir. 2018) ........ 26

**United States District Court Cases**

*Astiana v. Ben & Jerry's Homemade, Inc.*, No. C,
2011 WL 2111796 (N. D. Cal. May 26, 2011) ........ 4

*Atkins v. Amplitude, Inc.*,
No. 24-cv-04913, 2025 WL 2521732 (N.D. Cal. Sept. 2, 2025) ........ 5

*Brazil v. Dole Food Co.*,
935 F. Supp. 2d 947 (N.D. Cal. 2013) ........ 4

*Brown v. Google, LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 9, 17

*Bui-Ford v. Tesla, Inc.*,
2024 WL 694485 (N.D. Cal. Feb. 20, 2024) .......... 16

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) .......... 7

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 28

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) .......... 9

*Coinmint, LLC v. DX Corr Design, Inc.*,
No. 23-cv-00599-RS, 2023 WL 9595893 (N.D. Cal. Apr. 24, 2023) .......... 30

*Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*,
2025 WL 2539010 (N.D. Cal. Sept. 4, 2025) .......... 7, 15

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) .......... 8, 9, 10

*Ellusionist Cash Balance Plan & Tr. v. Spiegel Accountancy Corp.*,
2024 WL 4294645,n.3 (N.D. Cal. Sept 24, 2024) .......... 8

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) .......... 16, 17

*Faucett v. Move, Inc.*,
2024 WL 2106727 (C.D. Cal. Apr. 22, 2024) .......... 28, 29

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) .......... 11

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... *Passim*

*Houghton v. Leshner*,
2024 WL 5154071 (N.D. Cal. Nov. 25, 2024) .......... 20, 30

*Hunt v. Meta Platforms*,
735 F. Supp. 3d 1133 (N.D. Cal. 2024) .......... 30

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 16

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 9

*In re Google, Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 8, 12

*In re Meta Pixel Healthcare Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024) .......... 18

*In re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) .......... 7

*Ireland-Gordy v. Tile, Inc.*,
760 F. Supp. 3d 946 (N.D. Cal. 2024) .......... 32, 33

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 3

*Kittrich Corp. v. Chilewich Sultan, LLC*,
2013 WL 12131376 (C.D. Cal. Feb. 20, 2013) .......... 17

*Licea v. Cinmar, LLC*,
659 F. Supp. 3d 1096 (C.D. Cal. 2023) .......... 8

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) .......... 34, 35

*Mance v. Mercedes-Benz USA*,
901 F. Supp. 2d 1147 (N.D. Cal. 2012) .......... 30

*Mirmalek v. L.A. Times Commc'ns LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 14

*Ng v. Nissan N. Am., Inc.*,
Case No. 23-cv-00875-AMO, 2023 WL 9150275 (N.D. Cal. Dec. 27, 2023) .......... 3

*Nutanix, Inc. v. Tessell, Inc.*,
2025 WL 793652 (N.D. Cal. Mar. 12, 2025) .......... 19

*Regents of Univ. of Cal. v. Aisen*,
2016 WL 11783768 (S.D. Cal. Oct. 14, 2016) .......... 16

*Riganian v. LiveRamp Holdings, Inc.*,
2025 WL 2021802 (N.D. Cal. July 18, 2025) .......... 11

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) .......... 6, 7

*Rodriguez v. Google LLC*,
772 F. Supp. 3d 1093 (N.D. Cal. 2025) .......... 18

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) .......... 17

*Salas v. Universal Credit Servs.*,
No. 17-cv-2352 JLS, 2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) .......... 30

*Sanders v. Swift Transp. Co. of Ariz.*,
843 F. Supp. 2d 1033 (N.D. Cal. 2012) .......... 30

*Shah v. Fandom*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 11, 12

*Smith v. Google, LLC*,
2024 WL 2808270 (N.D. Cal. 2024) .......... 8

*United States v. Eady*,
2015 WL 1735495 (D.N.J. Apr. 15, 2015) .......... 13

*Wiedenbeck v. United Educ. Inst.*,
2015 WL 12743599 (C.D. Cal. Dec. 15, 2015) .......... 29, 30

*Young v. ByteDance, Inc.*,
700 F. Supp. 3d 808 (N.D. Cal. 2023) .......... 19, 20

*Young v. Solana Labs Inc.*,
2024 WL 4023087 (N.D. Cal. Sept. 3, 2024) .......... 19, 20

**California Supreme Court Cases**

*Alameda Cnty. Deputy Sheriff's Ass'n v. Alameda Cnty. Employee' Ret. Ass'n*,
9 Cal. 5th 1032 (2020) .......... 22

*City of Long Beach v. Mansell*,
3 Cal. 3d 462 (1970) .......... 22

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) .......... 18

*Ford Motor Warranty Cases*,
17 Cal. 5th 1122 (2025) .......... 24, 28

*Hohenshelt v. Super. Ct. of Los Angeles Cnty.*,
18 Cal. 5th 310, 573 P.3d 944 (2025) .......... 25

*Hostler v. Hays*,
3 Cal. 302 (1853) .......... 22, 25

*OTO, L.L.C. v. Kho*,
447 P.3d 680 (Cal. 2019) .......... 32

*Ramirez v. Charter Commc'ns, Inc.*,
16 Cal. 5th 478 (2024) .......... 31

**California Court of Appeal Cases**

*Ballesteros v. Ford Motor Co.*,
109 Cal. App. 5th 1196 (2025) .......... 26, 27

*Boucher v. All. Title Co., Inc.*,
127 Cal. App. 4th 262 (2005) .......... 24

*Cedars-Sinai Med. Ctr. v. Shewry*,
137 Cal. App. 4th 964 (2006) .......... 25

*Davis v. Nissan*,
100 Cal. App. 5th 825 (2024) .......... 26

*Doe v. Marten*,
49 Cal. App. 5th 1022 (2020) .......... 25

*Felisilda v. FCA US LLC*,
53 Cal. App. 5th 486 (2020) .......... 24

*Garcia v. Pexco, LLC*,
11 Cal. App. 5th 782 (2017) .......... 24

*Golden Day Schs., Inc. v. Dep't of Educ.*,
69 Cal. App. 4th 681 (1999) .......... 22, 26

*Goldman v. KPMG, LLP*,
173 Cal. App. 4th 209 (2009) .......... 23, 24, 28, 31

*Gorlach v. Sports Club Co.*,
209 Cal. App. 4th 1497 (2012) .......... 22

*In re Marriage of Turkanis & Price*,
213 Cal. App. 4th 332 (2013) .......... 25

*In re Marriage of Valle*,
53 Cal. App. 3d 837 (Cal. App. 1975) .......... 25

*Metalclad Corp. v. Ventana Environmental Organizational Partnership*,
109 Cal. App. 4th 1705 (2003) .......... 23, 24

*Mut. Cas. Co. v. Phila. Indem. Ins. Co.*,
169 Cal. App. 4th 340 (2008) .......... 25

*Nellie Gail Ranch Owners Ass'n. v. McMullin*,
4 Cal. App. 5th 982 (2016) .......... 25

*Orange Cnty. Water Dist. v. Ass'n of Cal. Water etc. Auth.*,
54 Cal. App. 4th 772 (1997) .......... 22

*Turtle Ridge Media Grp., Inc. v. Pacific Bell Directory*,
140 Cal. App. 4th 828 (2006) .......... 24

**California Superior Court Cases**

*Casillas v. Transitions Optical, Inc.*,
2024 WL 4873370 (Cal. Super. Sep. 09, 2024) .......... 13, 14

*Rodriguez v. Plivo Inc.*,
2024 WL 5184413 (Cal. Super. Oct. 02, 2024) .......... 6

**State Supreme Court Cases**

*Hirsch v. Amper Fin. Servs., LLC*,
215 N.J. 174, 71 A.3d 849 .......... 26

*Santich v. VCG Holding Corp.*,
443 P.3d 62 (Colo. 2019) .......... 26, 31

**Statutes**

Cal. Civ. Code § 1670.5(a) .......... 34

Cal. Penal Code § 502 .......... 28

Cal. Penal Code § 502(b)(1) .......... 15

Cal. Penal Code § 502(b)(5) .......... 16

Cal. Penal Code § 502(c) .......... 17

Cal. Penal Code § 502(c)(1) .......... 15

Cal. Penal Code § 502(c)(2) .......... 15

Cal. Penal Code § 502(c)(7) .......... 15, 16

Cal. Penal Code § 502(e)(1) .......... 17, 18

Cal. Penal Code § 630 ........ 12

Cal. Penal Code § 631(a) ........ 11

Cal. Penal Code § 632.7(a) ........ 11

Cal. Penal Code § 638.50(b) ........ 14

Cal. Penal Code § 638.51 ........ 28

**Rules**

Fed. R. Civ. P. 9(b) ........ 17

**INTRODUCTION**

This case is about software that tracks where people live, worship, receive medical care, and spend their time—all without their knowledge or consent. Defendant Verve Group Europe Gmbh ("Verve" or "Defendant") developed a "software development kit" or "SDK" that embeds in smartphone apps and siphons precise, timestamped geolocation data from users' cell phones. The collected location data reveals sensitive information about each consumer, such as their religious affiliation, sexual orientation, and medical conditions. Verve and its monetization partners then use this data to build comprehensive profiles of each consumer and sell them to third parties. All of this is done without any notice to the app user.

Plaintiff Alex Woods ("Plaintiff" or "Woods") is a user of the "Tagged" mobile app, who enabled location services for the sole purpose of sharing his location with Tagged. But Plaintiff did not—and could not—grant Verve permission to collect any information from his device using the Verve SDK. Plaintiff contends that Verve's surreptitious data collection violates California's Invasion of Privacy Act (CIPA) pen register statute and California's Comprehensive Computer Data Access and Fraud Act (CDAFA).

Verve's 12(b)(1) motion to dismiss argues that Plaintiff lacks Article III standing. But Plaintiff has sufficiently alleged a concrete injury with a "close relationship" to common law privacy harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016)). Far from collecting mere IP addresses or other basic contact information, Verve surreptitiously collects users' precise, timestamped geolocation coordinates, revealing exactly where they worship, associate, and receive medical care. This is a "highly offensive" invasion—one that parallels the common-law torts of intrusion upon seclusion and public disclosure of private facts—especially because consumers have a reasonable expectation of privacy against an unknown third party tracking their precise cellphone geolocation data. Plaintiff has Article III standing.

Verve's 12(b)(6) motion to dismiss alleges that Plaintiff has failed to plead specific facts to substantiate his CIPA and CDAFA claims. To start, Plaintiff sufficiently alleges that Verve's SDK

is an unauthorized pen register under CIPA § 638.51, as it is a "device or process" that surreptitiously recorded and collected Plaintiff's precise geolocation coordinates and personal information—all "addressing, or signaling information" governed by § 638.50(b). Not only did Plaintiff not consent to Verve's collection, he was never asked to, as neither Verve nor its collection practices were ever disclosed. Verve's other arguments rest on invented limitations found nowhere in CIPA's text, such as limiting the statute to law enforcement surveillance and telephone technologies when the legislature imposed no such constraints. Plaintiff also adequately alleges violations of CDAFA § 502: Verve knowingly accessed his cell phone by causing data to output from his device and occupying storage space without authorization.

Likewise, the Court should deny Verve's motion to compel arbitration. Verve is not a party to any arbitration agreement between Plaintiff and Tagged, as Tagged's terms of service explicitly exclude independent third parties like Verve. And Verve cannot use equitable estoppel or any other theory to invoke any arbitration agreement as a nonsignatory, as its preferred nonsignatory equitable estoppel test has been abrogated by *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), for being arbitration-specific. Moreover, the arbitration agreement and its delegation clause are unconscionable and unenforceable.

The Court should deny Defendant's Motion and allow the case to proceed accordingly.

## BACKGROUND

VGE is an ad tech company and data aggregator whose business model centers on collecting sensitive personal information from consumers, repackaging the information, and selling access to its data to advertisers as well as other data brokers. (*See* dkt. 20, First Amended Class Action Complaint, "FAC" ¶ 13.) This business model centers on the collection of "first-party data"—data obtained directly, often surreptitiously, from consumers. (*Id.* ¶ 14.) Verve collects its first-party data through its SDK, a collection of reusable pieces of computer code that can be dropped into smartphone applications to execute specific tasks. (*Id.* ¶ 15.)

Plaintiff Alex Woods is a Tagged app user whose timestamped geolocation coordinates, device identifiers, and app usage information were collected by Verve's SDK without his

knowledge or consent. Woods enabled location services solely to share his location with Tagged—not to provide Verve with the ability to track his precise movements and compile comprehensive profiles about his life, religious practices, medical visits, and other sensitive activities. (*Id.* ¶ 44.)

**STANDARD**

Verve seeks dismissal under Rule 12(b)(6). On a motion under Rule 12(b)(6), the Court "accepts all factual allegations as true and draws all reasonable inferences in favor of the plaintiff." *Ng v. Nissan N. Am., Inc.*, 2023 WL 9150275, at *2 (N.D. Cal. Dec. 27, 2023). "To survive a Rule 12(b)(6) motion, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To grant a 12(b)(6) motion based on an affirmative defense, the defendant must show 'some obvious bar to securing relief on the face of the complaint.'" *Ng*, 2023 WL 9150275, at *2 (*quoting ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

Verve also seeks dismissal under Rule 12(b)(1). An attack under Rule 12(b)(1) challenges the Court's subject matter jurisdiction over the claims. *See Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 937 (N.D. Cal. 2023) (*citing Spokeo, Inc.*, 578 U.S. at 338. "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

**ARGUMENT**

**I. PLAINTIFF HAS STANDING TO SUE VERVE.**

To establish standing, "a plaintiff must show that (i) [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. Plaintiff has established standing here.

**A. Plaintiff alleges a concrete injury-in-fact.**

Verve first contends that Plaintiff lacks Article III standing because he consented to any disclosures through the Tagged privacy policy. As explained below, this argument is wrong as a factual matter—there is no basis to conclude that Plaintiff consented to Verve's conduct. But with respect to whether such assent would suffice to show a lack of standing, the argument is legally flawed because the existence of a defense on the merits does not show a lack of standing. *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 834 (9th Cir. 2021) ("One does not lose standing to sue just because his claims may fail on the merits."); *Brazil v. Dole Food Co*., 935 F. Supp. 2d 947, 962 (N.D. Cal. 2013) ("It may ultimately prove true, as defendants claim, that plaintiffs have no actionable claims. However, that is not the same as finding no standing.") (quoting *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387, 2011 WL 2111796, at *5 (N. D. Cal. May 26, 2011)).

Moreover, Plaintiff alleges an injury analogous to one cognizable in a common-law court. *See TransUnion*, 594 U.S. at 414 ("Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'"). According to the Ninth Circuit, a privacy harm is analogous to two common-law privacy torts, intrusion upon seclusion and public disclosure of private facts, if the harm involves "highly offensive interferences or disclosures." *Popa v. Microsoft Corp.*, No. 24-14, 2025 WL 2448824, at *5 (9th Cir. Aug. 26, 2025) (quotation marks omitted). *Popa* found that Microsoft tracking the pet supplies that plaintiff browsed on their website wasn't "highly offensive" enough to be analogous to common-law privacy torts, because it was the equivalent of a store clerk observing shoppers in a store. *Id.* Fair enough. But by contrast, Verve's SDK collects 1) timestamped, 2) precise, 3) mobile geolocation coordinates that reveal everything about a users' whereabouts 24/7, including their religious affiliation, sexual orientation, and medical conditions. Unlike the basic information collected in *Popa*, Verve's SDK pinpoints users via their cell phones to precise locations at particular times—down to a church, hospital, or even addiction recovery center. None of the data Verve collects remains anonymous. (FAC ¶ 22.) This is precisely the "embarrassing,

invasive, or otherwise private information" that common-law privacy torts protect against. *Popa*, WL 2448824, at *5. Moreover, Verve compiles "highly personalized profiles" from users' locations and habits—which the Ninth Circuit directly held constitutes a "highly offensive" invasion of privacy. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 604, 606 (9th Cir. 2020).

Plaintiff's harms don't need to exactly mirror these common-law privacy torts; rather, the question is whether the asserted injury is similar in *kind* to common law torts, not *degree*. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.); *see also TransUnion*, 594 U.S. at 424 ("*Spokeo* does not require an exact duplicate in American history and tradition."). The injuries alleged by Plaintiff—surreptitious tracking of one's precise location—are of the *kind* that was historically actionable at common law. Indeed, in *Atkins v. Amplitude, Inc*., the plaintiffs alleged nearly identical facts to support identical claims under CIPA and the CDAFA—that the collection of "geolocation information, device IDs, device fingerprint data, information about other apps they were using on their device, [and] search terms input to the app . . . 'may reveal, for instance, a consumer's religious affiliation, sexual orientation, medical condition, and even whether the consumer is part of an at-risk population." No. 24-cv-04913, 2025 WL 2521732, at *1 (N.D. Cal. Sept. 2, 2025). There, the court found that "[d]isclosure of facts that allegedly reveal this highly sensitive information is sufficient to allege a concrete privacy harm analogous to those actionable under common law privacy torts." *Id.* (citing *Popa*, 2025 WL 2448824, at *6, *8). The result should be the same here.

Verve points to *Kishnani* and *Mitchener* to argue that Plaintiff's injury isn't concrete. But those cases are readily distinguishable. *Kishnani* and *Mitchener* involved the collection of IP addresses, "general" (not precise) geolocation data, and browser information from computer websites—basic information that was not "highly offensive" and carried no reasonable expectation of privacy. Verve's conduct is worlds apart for two reasons. First, Verve tracks users' physical locations through their cell phones. And the Supreme Court held that individuals have a reasonable expectation of privacy in cell phone location records. *Carpenter v. United States*, 585 U.S. 296, 313

(2018).[1] Cell phones are "indispensable to participation in modern society[,]" *id.* at 315; they go everywhere their owners go, creating a comprehensive record of physical movements that reveals "familial, political, professional, religious, and sexual associations." *Id.* at 311 (citations omitted).

Second, the difference between IP addresses and timestamped precise geolocation data is stark. While an IP address or general geolocation provides only a rough approximation of location—typically accurate to within a zip code or several miles, but not to a specific address—precise geolocation can pinpoint the exact GPS coordinates of an individual, even their elevation or floor level. Verve then timestamps those coordinates, allowing it to track individuals' whereabouts at particular times and to trace patterns in their movements. Unlike with basic IP addresses, it is highly offensive that Verve tracks consumers' precise location at all times—all without their consent or even knowledge of who Verve is. *Cf. Rodriguez v. Plivo Inc.*, No. 24STCV08972, 2024 WL 5184413, at *2 (Cal. Super. Oct. 02, 2024) ("Although Plaintiff alleges that the IP address could reveal the device's state, city, and zip code, this is not the type of sensitive data to which the *Greenley* court referred[,]" (emphasis added) such as data revealing "sensitive and private characteristics of consumers" like their "religious affiliation, sexual orientation, and medical condition'") (quoting *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1047 (S.D. Cal. 2023)).

And unlike the plaintiff in *Rodriguez v. Autotrader.com, Inc.*, No. 24-cv-08735, 2025 WL 1085787, at *1 (C.D. Cal. Apr. 4, 2025), who apparently "expected her privacy to be invaded," Plaintiff had no knowledge of Verve's existence—let alone that it was collecting his sensitive data. This is where Verve fundamentally misunderstands Plaintiff's claims. Plaintiff used the Tagged app. But Verve's collection of his data—and Verve's existence—was never disclosed to him. While Plaintiff may have expected Tagged to use his geolocation data, he did not consent to—and did not know about—Verve's collection and use of this data.

Finally, Verve accuses Plaintiff of having "sought out and downloaded the Tagged dating app in a blatant attempt to manufacture a claim under CIPA[.]" (Def.'s Mot. at 11.) This accusation

---

[1] *Carpenter* arose in the Fourth Amendment context, but the Ninth Circuit has "found analogies to Fourth Amendment cases applicable when deciding issues of privacy related to technology." *In re Facebook Internet Tracking Litig.*, 956 F.3d at 604 n.7.

is both uncivil and baseless. Verve provides no evidence besides unrelated cases—involving different plaintiffs and different defendants—filed to challenge the use of SDK trackers. For these reasons, cases like *Rodriguez*, 2025 WL 1085787 and *Byars v. Sterling Jewelers, Inc*., No. 5-22-cv-01456, 2023 WL 2996686, at *4 (C.D. Cal. Apr. 5, 2023)—both of which involved tester plaintiffs—are inapposite. Nor is there any truth to notion that Woods downloaded the app for any reason other than to use it to meet other people. The Court should disregard Verve's conjecture regarding whether Woods had a "mixed or legitimate motive in downloading the Tagged App." (Def.'s Mot. at 12.)

**B. Plaintiff's harms are directly traceable to Verve's SDK.**

Verve next claims that Plaintiff's harm suffered isn't traceable to it, repeating its argument that Woods consented to the data tracking (which fails for the reasons outlined below). Defendant also asserts that the FAC merely alleges that the Verve SDK was "designed to allow" data collection and that Woods never pleads his data was actually collected (Def.'s Mot. at 15) (quotations omitted). But that improperly reads the FAC in a light most favorable to Verve. *See e.g.*, *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc*., No. 24-cv-06993, 2025 WL 2539010, at *3 (N.D. Cal. Sept. 4, 2025). Woods pleads that his "timestamped geolocation information, device IDs, device fingerprint data, and information about which app(s) he uses on his mobile device" was collected and shared (FAC ¶ 44) and that the data "reveals where a consumer lives and works, and which locations they frequent" as well as "sensitive information about each consumer, such as their religious affiliation, sexual orientation, and medical conditions." (*Id.* ¶ 3.) Such allegations are sufficient at the motion to dismiss stage of the case.

**C. Plaintiff has standing to seek injunctive relief.**

In the alternative, Verve next argues for dismissal of the injunctive relief claims because Woods purportedly "has not alleged that he intends to use Tagged in the future and there is no plausible threat of future harm where Plaintiff could have removed" the app. (Def.'s Mot. at 15.) This is unpersuasive. At this point, all indications suggest that if Plaintiff used Tagged again, his data would be unlawfully intercepted by Verve. *See In re Yahoo Mail Litig*., 308 F.R.D. 577, 589

(N.D. Cal. 2015) (fact that plaintiffs theoretically could cease using Yahoo mail app to avoid future injury did not mean that plaintiffs lacked standing to sue for injunctive relief regarding alleged interception and reading of emails). The Court should refuse to dismiss the claims for injunctive relief this early. Plaintiff adequately alleges his claims for relief.

## II. PLAINTIFF DID NOT CONSENT TO VERVE'S CONDUCT.

Moving to the merits, Verve again insists that all of Plaintiff's claims fail because he provided consent. That consent has been established, according to Verve, through the Tagged terms of service (TOS) and Privacy Policy, which Verve says may be judicially noticed. The argument fails for multiple reasons.

First, Woods pleads that he had no knowledge of, was not notified of, and was never asked to consent to Verve's collection of his geolocation coordinates beyond the app. (FAC ¶ 21.) Courts generally hold that such allegations suffice at this stage. *See Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1106 (C.D. Cal. 2023).

Second, whether or not the various terms of service or privacy policies are subject to judicial notice, "[t]he[ir] mere existence . . . cannot establish at this stage, . . . that [the Plaintiff] did in fact consent." *Smith v. Google, LLC*, No. 23-cv-03527, 2024 WL 2808270, at *3 (N.D. Cal. 2024) (emphasis in original). Verve appears to appreciate the issue, offering a declaration from its own lawyer ("Rachman Decl.") purporting to establish, as a factual matter, that Woods must have agreed to these terms. These untested assertions, which contradict matters alleged in the FAC, cannot be considered at this stage. *See Ellusionist Cash Balance Plan & Tr. v. Spiegel Accountancy Corp.*, No. 23-cv-00287, 2024 WL 4294645, at *2 n.3 (N.D. Cal. Sept 24, 2024) (refusing to consider declarations on motion to dismiss).

Finally, Verve's exhibits would not establish consent even if the Court applies them to Plaintiff's Tagged account. "On a motion to dismiss, the burden of proof to show consent rests with [the] defendant[]." *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1253 (N.D. Cal. 2024). To establish actual consent based on Plaintiff's purported agreement to these documents, Verve must show that the documents "explicitly notif[ied]" Woods of the challenged practice. *In re Google,*

*Inc*., No. 13-MD-02430, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013). This notification must concern the "specific" practice at issue. *Campbell v. Facebook, Inc*., 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014): *see also Calhoun v. Google, LLC*, No. 22-16993, 113 F.4th 1141, 1147 (9th Cir. 2024) (consent "is only effective if the person alleging harm consented 'to the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent").

Stated differently, to obtain dismissal on consent grounds, Verve must show that the terms permit only the sole conclusion that they specifically disclosed the challenged conduct. *See In re Facebook, Inc., Consumer Privacy User Profile Litig*., 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) ("But recall that in the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation."). Documents that leave any doubt about whether Plaintiff consented to the challenged practice will not support dismissal. *See id.* at 789-90 ("[I]f a reasonable Facebook user could plausibly have interpreted the contract language as not disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent)") (emphasis in original); *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (rejecting consent defense where privacy policy did not expressly disclose the challenged data collection, and a user "might have reasonably concluded" that the collection did not occur); *FullStory*, 712 F. Supp. 3d at 1254 ("At this point . . . [h]ow reasonable persons would interpret the totality of the disclosures has not been decided. Accordingly, the claims will not be dismissed for any defendant based on consent.").

Verve fails to show that Tagged's myriad terms and policies clearly permit Verve's data collection, profile-building, and tracking. It is not at all clear that, by agreeing to the TOS and Privacy Policy, a consumer is granting Verve authority to track the consumer and compile a profile about him. Woods alleges that Verve used the information for its own purposes and that the alleged uses of Plaintiff's data go well-beyond those supposedly permitted through (even a generous reading of) the Tagged TOS and Privacy Policy. Discovery will reveal the scope and application of

any such terms, the meaning of which should not be decided via an attack on the pleadings. As such, the Court should decline to accept Verve's own interpretation of the Tagged App's Terms and Conditions and let discovery confirm what Verve did with Plaintiff's data before deciding whether Plaintiff consented to it.

## III. PLAINTIFF STATES A VALID CLAIM UNDER CIPA.

Verve claims that its SDK is not a pen register because CIPA § 638.51 is limited to law enforcement; CIPA's pen register provisions don't apply to internet technologies; Verve is "a party to the communications that authorized collection of information via the VGE SDK[;]" and Plaintiff's interpretation of CIPA would undermine the "functioning of the internet." (Def.'s Mot. at 17-18.) Each argument fails. As set forth below, CIPA's plain text imposes no law enforcement limitation, and courts have repeatedly held that CIPA's pen register provisions apply to new technologies like SDKs. And unlike CIPA's wiretap provision, its pen register provision contains no "party exception," even if Verve were a party to Plaintiff's communications (which it isn't). Finally, CIPA explicitly excludes from its pen register definition the routine collection of information obtained by providers in the ordinary course of business, while prohibiting non-ordinary data harvesting by undisclosed third parties who play no role in providing the application's services.

### A. CIPA's pen register prohibition is not limited to law enforcement.

Verve states that the "prototypical pen register is a device attached by law enforcement to a suspect's telephone line[.]" (Def.'s Mot. at 17.) From this, Defendant attempts to read a new provision into the statute: that CIPA is limited to asserting the "to the *interception* of communications by a third-party law enforcement officer, not *collection* by the party receiving the communications." (*Id.*) This argument flies in the face of CIPA's text. If the Legislature wanted to limit its application to law enforcement, it knew how to do so. But moreover, this argument has also been repudiated by caselaw. *See Greenley*, 684 F. Supp. 3d at 1050 ("[T]he California legislature does not limit [CIPA's] prohibition on installing pen registers to law enforcement.")

Nor are the "only persons who can obtain a court order 'peace officers" as Defendant alleges. (Def.'s Mot. at 17.) Section 638.52 merely "lists the procedures that law enforcement

officers must follow when applying for . . . a particular type of pen register: one that is installed on a telephone line." *Shah v. Fandom*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024). But the "statutory definition of a pen register is . . . not limited to the type most often utilized by law enforcement[,]" and § 638.52 "does not alter . . . the prohibition on non-law enforcement use of such pen registers." *Id.* The Court should decline to limit CIPA to law enforcement.

### B. CIPA's pen register prohibition applies to internet technologies, not just telephones.

Second, Verve makes a similar argument that CIPA's pen register provisions don't apply to internet technologies (Def.'s Mot. at 18.) But whereas "other sections of CIPA specifically *do* include language regarding telephones," CIPA § 638.51 does not. *Riganian v. LiveRamp Holdings, Inc.*, No. 25-cv-00824, 2025 WL 2021802, at *11 (N.D. Cal. July 18, 2025) (citing Cal. Penal Code §§ 631(a) (applying the statute to any "telegraph or telephone wire, line, cable, or instrument") and § 632.7(a) (applying the statute to "a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone")); *see also Garon v. Keleops USA, Inc.*, No. 25-cv-02124, 2025 WL 2522374, at *5 (N.D. Cal. Sept. 2, 2025) (adopting *Riganian*.) "[I]f the drafters of Section 638.50 intended for 'pen register' to be limited to telephone technologies, they knew how to say so." *Riganian*, 2025 WL 2021802, at *11. Defendant cannot read provisions into the statute that don't exist.

For similar reasons, Verve's contention that "[t]he information collected by a pen register is . . . entirety different from the information allegedly collected by VGE's SDK" fails. Defendant states that, unlike a "traditional" pen register, Verve's SDK does not track "who a user communicates with, how many times a user communicates with anyone, or for how long." (Def.'s Mot. at 18.) But Verve ignores that no matter how pen registers once operated, "[t]oday, pen registers take the form of software." *See Greenley*, 684 F. Supp. 3d at 1050. Indeed, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Garon*, 2025 WL 2522374, at *4 (*quoting Shah*, 754 F. Supp. 3d at 929). By its plain

text, CIPA § 638.51 prohibits any "process" used to intercept addressing information. According to the statute's "plain meaning," "[a] process can take many forms," and "[s]urely among them is software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *See Greenley*, 684 F. Supp. 3d at 1050. Verve's SDK is exactly the type of "device or process" that § 638.50(b) prohibits.

Most importantly, California law rejects that CIPA should be frozen in time at 1970s telephone technology. "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted." *Shah*, 754 F. Supp. 3d at 930. Instead, the California Supreme Court "regularly reads statutes to apply to new technologies" and has issued a clarion call about "the broad legislative intent underlying CIPA to protect privacy." *Id.* at 930-31 (quoting *Google*, 2013 WL 5423918, at *21). And none other than the California Legislature has made CIPA's legislative purpose unambiguous: to protect Californians against "the development of *new devices and techniques*" threatening an "invasion of privacy" that "has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630 (emphasis added); *see also Greenley*, 684 F. Supp. 3d at 1050 ("[T]he Court cannot ignore the expansive language in the California Legislature's chosen definition. The definition is specific as to the type of data a pen register collects . . . but it is vague and inclusive as to the form of the collection too—'a device or process.'"). Not only *can* courts apply CIPA to new technologies. California law instructs courts to do so.

**C. The pen register statute has no "party" exception.**

Finally, Verve claims that CIPA does not apply "[b]ecause Tagged is a party to Plaintiff's purported communications[.]" (Def.'s Mot. at 17) (citing *Thomas v. Papa John's Int'l, Inc.*, No. 24-3557, 2025 WL 1704437, at * 1 (9th Cir. June 18, 2025)). As a threshold matter, Defendant confuses CIPA's wiretapping provision (CIPA § 631) with its pen register provision (CIPA § 638.51). *Thomas* interpreted the former, but Plaintiff's claim is under the latter. To the extent Defendant argues that CIPA § 638.51 has a "party" exception, it cannot derive such a rule from

*Thomas*, and it provides no support or argument otherwise. Nor could it — the statute lists specific exceptions in § 638.51(b), and being a "party to the communication" isn't one of them. Verve can't import a party exception from an entirely different provision to evade liability here.

But even applying such a wiretapping framework to Plaintiff's pen register claim fails. Again, Defendant seems to fundamentally misunderstand that Plaintiff's claims are not against Tagged, but against Verve—a third party that Plaintiff did not (and could not) know about. Plaintiff alleges that Verve used a pen register to surreptitiously track Woods' location and compile a comprehensive dossier about him and others—something Plaintiff did not (and could not) consent to. Verve is not a "party" to any information Plaintiff shared with Tagged in such a scenario. *Cf. United States v. Eady,* No. CRIM.A. 14-277, 2015 WL 1735495, at *2 (D.N.J. Apr. 15, 2015) ("The ability to intercept a communication of others without the knowledge of any party to those communications does not render the person who intercepts the communication a 'party.'")

**D. The best reading of CIPA will not undermine internet operations or the California Consumer Privacy Act (CCPA).**

In an effort to avoid the best reading of CIPA's statutory text, Verve asserts that Plaintiff's interpretation of a pen register "would expose anyone to liability under CIPA § 638.51 that uses a Caller ID" or similar services. (Def.'s Mot. at 17.) But there is no basis for such a claim. Caller ID is a service that consumers consent to and use themselves. *See* CIPA § 638.51(b)(5). It is not surreptitiously installed and used by undisclosed third parties to compile detailed profiles about called parties.

Nor will CIPA impose liability on websites or services that merely collect "IP Addresses to provide their services." (Def.'s at Mot. 18.) CIPA's very "terms . . . make that clear." *Casillas v. Transitions Optical, Inc.*, No. 23STCV30742, 2024 WL 4873370, at *4 (Cal. Super. Sep. 09, 2024). In *Casillas*, the court held that § 638.51 does not—and cannot—impose liability on "website operators," *id.* at *4 n.2, and other "electronic communications service[s]," for collecting IP addresses. That's because CIPA defines the term "pen register" to exclude "a 'process used by a provider or customer of [an] . . . electronic communication service for . . . communications service

provided by such provider . . . or other similar services in the ordinary course of business.'" *Id.* at *4. (citing Cal. Penal Code, § 638.50(b)). The court also noted that—even if IP address collection somehow fell under the statute—CIPA exempts from liability websites or services that collect IP addresses "to 'operate, maintain, and test [an] . . . electronic communication service' or to 'record the fact that [an] . . . electronic communication was initiated or completed." *See id.* (citing Pen. Code, § 638.51(b)). "What makes the internet possible[,]" then—data collected *by* the website operator *for* the website's necessary functions—does not violate CIPA. *Id.* Of course. What *does* violate CIPA is data collected by an unknown third party like Verve, who embeds its SDK into applications, siphons user data for its own commercial purposes, has no relationship to the user, and plays no role in providing the application's services. What Verve did is a far cry from the routine collection of IP addresses necessary to operate a website.

Verve also offers no support for its assertion that Woods's CIPA claim "would undermine and contravene the CCPA." (Def.'s Mot. at 20.) To the contrary, courts have stated that the "CCPA does not preempt CIPA." *Mirmalek v. L.A. Times Commc'ns LLC*, No. 24-cv-01797, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024). Moreover, the "CCPA explicitly states that 'in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control.'" *Id.* (rejecting similar argument and finding that the "CCPA and CIPA are complementary."). Therefore, even if a conflict existed between CIPA and the CCPA—which Verve hasn't argued because it can't—the CCPA's own provisions would require applying CIPA here, given its stronger privacy safeguards for consumers.

**E. The FAC specifically pleads that Woods had his personal information captured by Verve's SDK Tracker.**

Verve next repeats its objection to the allegations specific to Plaintiff, claiming once again that the FAC "hypothesizes that Tagged *allows* VGE to collect certain 'geolocation' information generally, not that the VGE SDK actually did so when Plaintiff used the Tagged app." (Def.'s Mot. at 21.) This again fails for the reasons set forth above—the allegations must be viewed in a light

most favorable to Plaintiff, not to Verve. *See e.g.*, *Doe (K.R.D.)*, 2025 WL 2539010, at *3; *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009). Verve intercepted and misused Plaintiff's precise geolocation coordinates, mobile advertising ID, mobile app name, and device fingerprint data without his consent. (FAC ¶¶ 42-44.) That is sufficient at the motion to dismiss stage.

## IV. PLAINTIFF STATES A VALID CDAFA CLAIM.

Verve seeks to dismiss Plaintiff's claim under the CDAFA. As relevant here, to violate the CDAFA, an entity must either:

> (1) "[k]nowingly access[] and without permission alter[], damage[], delete[], destroy[], or otherwise use[] any . . . computer [or] computer system . . . in order to . . . wrongfully control or obtain money, property, or data," (Cal. Penal Code § 502(c)(1));
>
> (2) "[k]nowingly access[] and without permission take[], copy[], or make[] use of any data from a computer [or] computer system" (Cal. Penal Code § 502(c)(2)); or
>
> (3) "[k]nowingly and without permission access[] or cause[] to be accessed any computer [or] computer system" (Cal. Penal Code § 502(c)(7)).

Here, Plaintiff adequately pleads CDAFA claim under each subsection.

### A. Plaintiff adequately alleges that Verve accessed his computer system.

Verve claims that the FAC "lacks sufficient factual allegations detailing how VGE allegedly 'accessed' Plaintiff's device." (Def.'s Mot. at 23.) This is incorrect. As defined by the statute, "access" means to "cause output from" the "logical, arithmetical, or memory function resources of a computer[.]" Cal. Penal Code § 502(b)(1). Woods specifically pleads that Verve "provides technology or code to customers that is used to collect consumers' geolocation coordinates, mobile advertising IDs, the mobile app name, and/or device fingerprint data[,]" (FAC ¶ 57), and that "Defendants' SDK and other technology or code occupied Plaintiff's and the Class's storage space on their devices without authorization . . . [and] caused data to be output from Plaintiff's and the Class's mobile devices over their cellular data plan," (*Id.* ¶ 65.) Plaintiff alleges in plain terms that the SDK embeds computer code into the app and that data is accessed via "electronic communications transmitted by their devices." (*Id.* ¶ 56.)

Likewise, Woods pleads that Verve "used" and "made use of data from a computer system" (Def.'s Mot. at 23) by accessing data from Plaintiff's and the Class Members' cell phones. Cell phones meet the statutory definition of "computer systems."[2] (FAC ¶ 62); *see Regents of Univ. of Cal. v. Aisen*, No. 15-cv-1766, 2016 WL 11783768, at *5 (S.D. Cal. Oct. 14, 2016) (explaining definition "is not particularly technical.") Modern cell phones are devices that contain computer programs and perform functions like data storage, retrieval, and communication. Smart phones are defined as "small computers,"[3] and the Ninth Circuit has equated laptop computers and smartphones for Fourth Amendment purposes. *See United States v. Cano*, 934 F.3d 1002, 1015 (9th Cir. 2019). Verve cannot credibly claim cell phones aren't computer systems.

Verve also asserts that the § 502(c)(7) claim should be dismissed because Woods "does not allege that VGE circumvented technical or code-based barriers to 'access' his device." (Def.'s Mot. at 24) (citing *Bui-Ford v. Tesla, Inc.*, No. 23-cv-02321, 2024 WL 694485, at *5 (N.D. Cal. Feb. 20, 2024)). Some decisions, like *Bui-Ford* and beginning with *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010), do reason that access "without permission" under the CDAFA was limited to situations in which the defendant "circumvent[ed] technical or code-based barriers[.]" But courts have subsequently rejected *Power Ventures*' reasoning. As one court explained when rejecting *Power Ventures*: "[h]olding that a defendant acts with 'permission' for purposes of the CCDFA any time it does not need to overcome 'technical or code based barriers in place to restrict or bar a user's access' leads to results which strain the plain and ordinary meaning of the term 'permission.'" *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1100 (N.D. Cal. 2015). Indeed, *Power Ventures* largely was concerned about a ruling that access in violation of a terms of use or service would be criminalized, in potential violation of the rule of lenity. *See* 2010 WL 3291750, at *11. By offering circumvention of technical or code-based

---

[2] "Computer system" means a device or collection of devices, including support devices . . . , one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

[3] Smartphone, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/smartphone (last visited Oct. 3, 2025).

barriers as an alternative, the decision was not drawing a bright line. *See id.*; *see also In re Carrier IQ, Inc.*, 78 F. Supp. at 1099 ("Nothing in the *Power Ventures* decision held that overcoming 'technical or code-based barriers' designed to prevent access was the *only* way to establish that the Defendant acted without permission."). Better reasoned decisions, like *Brown*, 525 F. Supp. 3d at 1064 and *Greenley*, 684 F. Supp. 3d at 1050 reject this atextual barrier. *See also Rodriguez v. Google LLC*, No. 20-cv-04688, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) (discounting *Power Ventures* and finding that "[b]ecause plaintiffs have alleged Google's knowing access to, and unpermitted taking of, plaintiffs' app activity data, they adequately state a claim under the CDAFA"). This Court should as well.

**B. Woods alleges that Verve accessed Plaintiff's device "knowingly."**

Verve's claims that Plaintiff cannot allege knowing conduct by Verve given that "VGE contractually required Tagged to use VGE's software lawfully and with informed user consent." (Def.'s Mot. at 23) (*citing* Guinto Decl. ¶¶ 6-9, Exhibit 1 §§ 5.4, 7.1, Exhibit 2 §§ 6(1), 6(4)). As previously discussed, Plaintiff did not consent to Verve's access of his device. Moreover, under the federal rules, knowledge "and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiff "need only plead enough facts that plausibly give rise to the inference" that Defendant knowingly accessed Plaintiff's cell phone. *Kittrich Corp. v. Chilewich Sultan, LLC*, No. CV 12-10079, 2013 WL 12131376, at *6 (C.D. Cal. Feb. 20, 2013).

Plaintiff has met this burden. After all, Verve's very business model relies on collecting first-party data. (FAC ¶ 14.) Unlike the term willfully, which "refers to a culpable state of mind," *Bryan v. United States,* 524 U.S. 184, 191 (1998), "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense," *id.* at 193. Plaintiff has plead enough facts that Verve's SDK performed the function that Verve knew it would—and designed it to—perform.

**C. Woods also pleads damages.**

Verve also alleges that Plaintiff "fails to plead that he 'suffer[ed] damage or loss . . . ." (Def.'s Mot. at 24) (citing Cal. Penal Code § 502(e)(1)). The CDAFA does not define "damage or loss," nor does it limit a plaintiff to recovery of damages for particular types of harm. *See* Cal. Penal

Code § 502(c). Rather, the CDAFA offers an exemplar that merely "include[s]" the listed damages. Cal. Penal Code § 502(e)(1) (emphasis added); *see Flanagan v. Flanagan*, 27 Cal. 4th 766, 774 (2002) ("'Includes' is ordinarily a term of enlargement rather than limitation. The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (cleaned up). And "[a]s the statute sets no minimum threshold for damage or loss, even small harms due to depletion of battery and bandwidth satisfy CDAFA's requirements." *Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1110 (N.D. Cal. 2025) (denying summary judgment on CDAFA claims where "Plaintiffs have provided sufficient evidence to show harm for at least nominal damages under this theory.")

The FAC adequately alleges Plaintiff's damage under CDAFA, alleging that Defendant's SDK and code "occupied Plaintiff's and the Class's storage space on their devices," depleted Plaintiff's cellular plan, and used the resources of his device. (FAC ¶ 65.) Plaintiff also alleges that Defendant was unjustly enriched and profited from this data. (*Id.*) These allegations of measurable impact on Woods's device—depleted storage space, consumed cellular data, and exhausted device resources—suffice to allege cognizable loss under CDAFA. *See In re Meta Pixel Healthcare Litig.*, 713 F. Supp. 3d 650, 658–59 (N.D. Cal. 2024) (holding similar allegations to be sufficient).

**V. VERVE'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED.**

"[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). A defendant who is not a party to an arbitration agreement may enforce such an agreement against a signatory plaintiff only if it can show that (1) "a valid agreement to arbitrate exists and . . . encompasses the dispute at issue[,]" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000), and (2) "the relevant state contract law allows the [non-signatory] litigant to enforce the agreement." *Kramer*, 705 F.3d at 1128.

Verve argues that the Tagged arbitration agreement covers disputes against Verve, and that even if not, California's equitable estoppel doctrine allows it to enforce arbitration as a non-party.

(Def.'s Mot. at 25-33.) None of these arguments have merit. There is no agreement at all between Woods and Verve, let alone one to arbitrate. Moreover, allowing Verve to enforce arbitration requires an arbitration-specific estoppel rule inconsistent with the Federal Arbitration Act ("FAA") and California precedent. Furthermore, the Tagged arbitration agreement is procedurally and substantively unconscionable and thus unenforceable.

**A. This Court—not an arbitrator—decides the question of arbitrability.**

At the threshold, Verve claims that the arbitration agreement "clear[ly] and unmistakab[ly]" delegates to the arbitrator the ability to decide "gateway questions of arbitrability"—and thus, the arbitrator, not this Court, should decide if Verve can enforce it. (Def.'s Mot. at 9.) As an initial matter, it's not clear that the delegation clause unmistakably delegates decisions of *enforceability* of the agreement. In a section title "Arbitration Procedures," the TOS merely states that "[a]ll issues shall be for the arbitrator to decide, including the *scope* of this Arbitration Agreement." (Def.'s Mot. Ex. D at 6) (emphasis added).

But even if the Tagged TOS purports to delegate enforceability questions, "[c]ontrolling Ninth Circuit authority provides that the court, not the arbitrator, decides questions of arbitrability involving judicial doctrines and non-signatories." *Nutanix, Inc. v. Tessell, Inc.*, No. 24-cv-01729-AMO, 2025 WL 793652, at *4 (N.D. Cal. Mar. 12, 2025) (citing *Kramer*, 705 F.3d at 1127). Indeed, as another court in this district has noted, "it's not clear how a nonparty to an arbitration agreement could ever invoke a delegation provision when seeking to compel arbitration based only on equitable estoppel." *Young v. ByteDance, Inc.*, 700 F. Supp. 3d 808, 813 (N.D. Cal. 2023) (Chhabria, J.). "By definition, there is no contract formed between a party to the contract and a nonparty asserting equitable estoppel, and so the nonparty cannot invoke the delegation provision." *Id*. at 813.

Furthermore, even if a nonparty could invoke a delegation provision as a general matter, the provision must provide "a clear and unmistakable agreement to arbitrate arbitrability with nonsignatories." *Young v. Solana Labs Inc.*, No. 22-cv-03912-RFL, 2024 WL 4023087, at *5 (N.D. Cal. Sept. 3, 2024) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here,

because the Tagged TOS (including the arbitration agreement) are expressly limited to Tagged and its customers, no such clear and unmistakable delegation agreement is present. *See id*. at *4–6 ("Although Young may have agreed to arbitrate arbitrability with Exodus, Defendants have not provided clear and unmistakable evidence that Young agreed to arbitrate arbitrability with *them* as nonsignatories.") (emphasis in original); *ByteDance*, 700 F. Supp. 3d at 813 ("[E]ven if one were to adopt the assumption that a third party asserting equitable estoppel could in some cases invoke a delegation provision, TikTok cannot do so here, because the only reasonable interpretation of this particular delegation provision is that the parties intended it to apply only to disputes between Velez and Telus."); *Houghton v. Leshner*, No. 22-cv-07781-WHO, 2024 WL 5154071, at *4–5 (N.D. Cal. Nov. 25, 2024) (same). Verve's citation of *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63 (2019) only exposes its confusion on this point. As *Henry Schein* itself explains, "*parties* may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Id.* at 69 (emphasis added).

**B. Claims against Verve are not "disputes" subject to arbitration under the Tagged TOS.**

Verve next claims that Plaintiff's claims are a "dispute" that falls "within the scope of the arbitration agreement." (Def.'s Mot. at 27.) This is because, Verve claims, Plaintiff's claim "arise[s] out of Plaintiff's use of the Tagged App, which is necessarily governed by the Tagged TOS and Privacy Policy." (*Id.*) But the term "Dispute" as used in the Tagged TOS shows that the arbitration agreement is limited to Tagged. The agreement defines the term to mean "any dispute, claim, or controversy *between you and Tagged regarding any aspect of your relationship with Tagged*, whether based in contract, statute, regulation, ordinance, tort . . . ." (Def.'s Mot. Ex. D at 5 (emphasis added).) It does not mention Verve or any other third parties.

No agreement with Verve exists at all. The Tagged TOS states "that all Disputes between you and The Meet Group, Inc. shall be resolved by binding arbitration." (Def.'s Mot. Ex. D at 5.) The arbitration agreement itself states that for the purposes of arbitration, "Tagged" means the Meet Group, Inc. and its parents, subsidiaries, and affiliated companies, and each of their respective

officers, directors, employees, and agents. *Id.* Verve is not a parent, subsidiary, or affiliate of Tagged.[4] Verve also makes no contention that it is related to Tagged as an officer, director, employee, or agent.

The arbitration provision also features a pre-dispute resolution process that requires "mailing written notification to The Meet Group, Inc., 100 Union Square Drive, New Hope, PA 18938, USA." *Id*. Under its terms, "[i]f *Tagged* does not resolve the Dispute to your satisfaction within 45 days after it receives your written notification, you may pursue your Dispute in arbitration." *Id*. No option is provided for a consumer like Woods to initiate such a procedure with third parties. Moreover, Tagged's TOS *do* specify certain third-party beneficiaries who may enforce the terms: "Apple and Apple's subsidiaries" and Google are third party beneficiaries of the Tagged TOS. (TOS ¶¶ 20-21.) The terms could have been written to include claims against Verve. But they do not.

### C. Verve cannot enforce the Tagged arbitration agreement through equitable estoppel

A litigant can enforce an arbitration agreement to which it is not a party "if the relevant state contract law allows" it. *Kramer*, 705 F.3d at 1128 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Here, Verve argues that California state law of equitable estoppel allows it to enforce the Tagged arbitration agreement. While Plaintiff agrees that California provides the relevant state contract law, Verve's equitable estoppel argument fails for several reasons.[5]

#### 1. Traditional elements of equitable estoppel are not met here

Under California law, equitable estoppel requires four elements: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the

---

[4] A "subsidiary" is "[a] corporation in which a parent corporation has a controlling share," Corporation, Black's Law Dictionary (12th ed. 2024)), and an affiliate is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary (12th ed. 2024).

[5] California law governs questions of state law in this Court absent a party identifying a meaningful conflict between California law and the law of another state. *Homedics, Inc. v. Valley Forge Ins. Co., a Pa. Corp.*, 315 F.3d 1135, 1138 (9th Cir. 2003).

other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Alameda Cnty. Deputy Sheriff's Ass'n v. Alameda Cnty. Employee' Ret. Ass'n*, 9 Cal. 5th 1032, 1072–73 (2020). Of all of these elements, "the sine qua non of estoppel" is the fourth element: detrimental reliance. *Gorlach v. Sports Club Co.*, 209 Cal. App. 4th 1497, 1506 (2012); *see also Orange Cnty. Water Dist. v. Ass'n of Cal. Water etc. Auth.*, 54 Cal. App. 4th 772, 780 (1997) (same). This principle is fundamental to California law and has been for over 150 years. *See Hostler v. Hays*, 3 Cal. 302, 306–07 (1853) (equitable estoppel requires that someone "by his representations has led others to act"); *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 488 (1970) (demonstrating that special emphasis on detrimental reliance in estoppel has been "[l]ong established in the judicial decisions of this state[]" since the nineteenth century). It is a fundamental axiom of California law that "[w]ithout detrimental reliance, there can be no estoppel." *Golden Day Schs., Inc. v. Dep't of Educ.*, 69 Cal. App. 4th 681, 693 (1999).

To invoke equitable estoppel, then, Verve must show that Plaintiff deliberately induced Verve to rely on his acts or representations and that Verve relied on those acts or representations to its detriment. Verve cannot make this showing and doesn't even try to. Plaintiff has made no representation and engaged in no conduct intended to induce Verve into believing that Plaintiff would arbitrate any disputes that might arise between them. Plaintiff had no pre-existing relationship with Verve, or "even [knew] who or what . . . Verve [is]." (FAC ¶ 19). As a result, Verve never claimed—nor could it—that the elements that have equitable estoppel have been met.

### 2. Verve invokes an arbitration-specific version of equitable estoppel that has been abrogated by the United States Supreme Court

Conceding that traditional principles of equitable estoppel do not help it here, Verve instead invokes a version of the doctrine currently used by the Ninth Circuit: that a non-signatory can enforce an arbitration agreement when (1) "the claims [against the nonsignatory] are 'intimately founded in and intertwined with' the underlying contract," *Herrera v. Cathay Pac. Airways Ltd.*, 104 F. 4th 702, 707, 707 n.5 (9th Cir. 2024) (quoting *Kramer*, 705 F.3d at 1128–29,  or (2) "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory

and another signatory and 'the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement,'" *id.* at 707 n.5 (quoting *Kramer*, 705 F.3d at 1128–29). This rule originated in a Ninth Circuit case called *Kramer*, which derived this test from a series of California intermediate court decisions, namely *Metalclad Corp. v. Ventana Environmental Organizational Partnership*, 109 Cal. App. 4th 1705 (2003).

But *Metalclad* and its progeny have been preempted by the U.S. Supreme Court's decision in *Morgan v. Sundance*, 596 U.S. 411 (2022). These decisions created a "bespoke rule" that singles out arbitration for special treatment over all other contracts. *Id.* at 417. For this reason, Verve's preferred arbitration-specific rule has been invalidated by the FAA. This Court should instead apply traditional equitable estoppel principles.

**a. Verve's equitable estoppel standard derives from California intermediate court opinions applying (abrogated) federal law.**

The origins of this arbitration-specific estoppel rule come from *Metalclad Corp.* and its progeny.[6] In what it called an "[i]ssue of [f]irst [i]mpression in California[,]" *Metalclad* expressly held that "federal law, not state law" controlled whether a non-signatory could enforce an arbitration agreement. *Metalclad*, 109 Cal. App. 4th at 1712–14 (emphasis omitted). To discern what federal standard would apply, the court looked to federal decisions from the Eleventh Circuit. *Id*. at 1716–17 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999) and *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 756–57 (11th Cir.1993)). In those cases, federal courts had permitted non-signatories to compel arbitration of claims "intimately founded in and intertwined" with the underlying contract—specifically to advance the federal policy "in favor of arbitration." *Metclad Corp.*, 109 Cal. App. 4th at 1712–13. The *Metalclad* court believed it was

[6] *See Kramer*, 705 F.3d at 1128–29 (citing *Metalclad*, 109 Cal. App. 4th 1705 (2003) and *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 219 (2009) for the rule); *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870–71 (9th Cir. 2021) (deriving rule from *Metalclad* and quoting it at length); *Herrera*, 104 F.4th at 707 (deriving the California rule from *Franklin* and *Kramer's* treatment of *Metalclad*); *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 209 (9th Cir. 2020) (same, and dubbing the two components of the arbitration-specific rule the "*Goldman* scenario[s]").

bound to apply this arbitration-friendly test as part of the "federal substantive law of arbitrability." *Id.* at 1713 (internal quotations omitted).

Six years after *Metalclad*, the Supreme Court definitively rejected its foundational premise. *Arthur Anderson LLP v. Carlisle* held that the FAA did not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." 556 U.S. at 630. "State law, therefore, is applicable to determine which contracts are binding under [FAA] § 2 and enforceable under [FAA] § 3," *id.* at 630–31, and state law specifically governs "estoppel." *Id.* at 631. *Arthur Anderson LLP* plainly abrogated *Metalclad* and the line of cases that trailed it. Even the Eleventh Circuit cases on which *Metalclad* relied—*MS Dealer* and *Sunkist*—were both abrogated by *Arthur Andersen*, 556 U.S. at 630–31.

But post-*Arthur Andersen*, California appellate courts continued to uncritically apply and expand *Metalclad*'s holding. For example, the appellate court in *Goldman* stated it was applying "governing federal law." 173 Cal. App. 4th at 219; *see also Boucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262, 268 (2005) (stating that whether a non-signatory can rely on an arbitration clause to compel a plaintiff to arbitrate "is answered not by state law, but by the federal substantive law of arbitrability"); *Turtle Ridge Media Grp., Inc. v. Pacific Bell Directory*, 140 Cal. App. 4th 828, 832–833 (2006), *as modified* (July 20, 2006) (answering the same question by "turn[ing] to federal arbitration law"); *Garcia v. Pexco, LLC*, 11 Cal. App. 5th 782, 785–86 (2017) (citing *Boucher* and *Metalclad* without further analysis); *Felisilda v. FCA US LLC*, 53 Cal. App. 5th 486, 496–96 (2020), *disapproved of by Ford Motor Warranty Cases*, 17 Cal. 5th 1122 (2025) (citing *Boucher* and *Goldman* without further analysis).

The Ninth Circuit then imported this defective doctrine wholesale. In *Kramer*, the Ninth Circuit cited *Metalclad* and *Goldman* as establishing California's equitable estoppel law. 705 F.3d at 1128–29. The court apparently did not recognize it was citing California cases that applied federal law, when *Arthur Andersen* had subsequently established that state law governs. This created a perfect circle of confusion: federal courts citing state courts that were applying federal law, when state law should have controlled. Subsequent Ninth Circuit decisions—*Franklin v. Cmty.*

*Reg'l Med. Ctr.*, 998 F.3d 867 (9th Cir. 2021); *In re Pacific Fertility Center Litigation*, 814 F. App'x 206 (9th Cir. 2020); and most recently *Herrera v. Cathay Pacific Airways Ltd.*, 104 F.4th 702 (9th Cir. 2024)—have perpetuated this error without analyzing the issue.[7]

**b. *Morgan v. Sundance* has invalidated *Metalclad* and *Goldman*'s arbitration-specific estoppel rule.**

*Morgan* held that "courts are not to create arbitration-specific" rules above and beyond how they treat "other contracts." 596 U.S. at 412. In other words, *Morgan* clarified that the FAA's longstanding "equal footing" principle cuts both ways—courts may neither disadvantage arbitration agreements compared to other contracts, nor devise special rules to favor them. Thus, the FAA preempts state laws—like the more lenient arbitration-specific equitable estoppel test in *Metalclad* and *Goldman*—that don't treat "arbitration contract[s] just as the court would to any other kind" or "devise novel rules to favor arbitration over litigation." *Id.*; *see Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (state laws are preempted if they "undermine the goals and policies of the FAA.")

Some factors evincing whether a rule is arbitration-specific under *Morgan* includes when the rule "deviate from generally applicable state law contract principles" or "invent special, arbitration-preferring procedural rules." *Hohenshelt v. Super. Ct. of Los Angeles Cnty.*, 18 Cal. 5th 310, 573 P.3d 944, 949 (2025). And *Metalclad* vastly deviates from the traditional California rule of equitable estoppel requiring detrimental reliance, which dates back 150 years. *See Hostler*, 3 Cal. 302, 306–07 (1853) (equitable estoppel requires that someone "by his representations has led others to act"). In every single other context,[8] California courts are clear that "[w]ithout detrimental

[7] Though decided after *Morgan*, *Herrera* never cites it, and (so far as it can be discerned from the opinion) no party seems to have flagged the preemption issue for the Court. "Questions that merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (cleaned up) (holding that cases are "not precedential for propositions not considered, or for matters that are simply assumed[]").

[8] *See Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 969–74, 987 (2006) (contracts); *Doe v. Marten*, 49 Cal. App. 5th 1022, 1025–26, 1028–32 (2020) (medical malpractice); *Nellie Gail Ranch Owners Ass'n. v. McMullin*, 4 Cal. App. 5th 982, 998–99 (2016), *as modified on denial of reh'g* (Oct. 27, 2016) (real estate); *In re Marriage of Turkanis & Price*, 213 Cal. App. 4th 332, 336, 352 (2013) (community property); *Emps. Mut. Cas. Co. v. Phila. Indem. Ins. Co.*, 169 Cal. App. 4th

reliance, there can be no estoppel." *Golden Day Schs.*, 69 Cal. App. 4th at 693. The California Supreme Court has never suggested this changes when arbitration is involved. Indeed, one California court noted that calling *Metalclad*'s standard "equitable estoppel" is "a bit of a misnomer" because it "does not require the nonsignatory's detrimental reliance . . . *as traditional equitable estoppel doctrine would*." *Ballesteros v. Ford Motor Co.*, 109 Cal. App. 5th 1196, 1207 n.2 (2025) (emphasis added).

Other California appellate courts have recognized the tension, too. In *Davis v. Nissan*, the court was troubled that *Metalclad*'s error created two distinct doctrines in California: "In the arbitration context, California courts have not applied the four traditional elements for equitable estoppel" that the Supreme Court of California has consistently required. 100 Cal. App. 5th 825, 835 n.3 (2024). The *Davis* court did not rule that *Metalclad*'s rule was arbitration-specific in violation of *Morgan* "because it ha[d] not been briefed by the parties." *Id.* But as the *Davis* court noted, "other jurisdictions have rejected such an arbitration-specific version of equitable estoppel" that does away with detrimental reliance. *Id. See Santich v. VCG Holding Corp.,* 2019 CO 67, ¶ 10, 443 P.3d 62, 65–66 ("We see no compelling reason to depart from our traditionally defined elements of equitable estoppel [including detrimental reliance] to craft an arbitration-specific rule."); *Hirsch v. Amper Fin. Servs., LLC*, 215 N.J. 174, 192–93, 71 A.3d 849, 859 ("Stated simply, we reject intertwinement as a theory for compelling arbitration when its application is untethered to any . . . evidence of detrimental reliance . . . ."); *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) (applying Illinois law to hold that because "Subway cannot show detrimental reliance . . . . Subway cannot rely on estoppel to enforce the arbitration agreement"); *Scheurer v. Fromm Fam. Foods LLC* 863 F.3d 748, 753 (7th Cir. 2017) (noting Wisconsin law "reject[s] equitable estoppel claims when the party seeking to apply estoppel could not show specific facts supporting reasonable and detrimental reliance").

---

340, 345–46, 349–50 (2008) (insurance contribution); *In re Marriage of Valle*, 53 Cal. App. 3d 837, 840–42 (Cal. App. 1975) (child custody and marital support).

*Metalclad* is arbitration-specific, because it relied on a so-called "federal policy favoring arbitration" to vastly deviate from traditional California equitable estoppel doctrine. Because *Metalclad* is arbitration-specific, it has been invalidated by *Morgan* and the FAA. As a result, this Court should apply traditional equitable estoppel principles to Verve's attempt to invoke estoppel—a standard that Verve cannot meet.

**3. Verve fails to satisfy even the arbitration-specific version of the equitable estoppel.**

Even if this Court applies Verve's preferred arbitration-specific rule of nonsignatory equitable estoppel, Verve's attempt to compel arbitration fails.

**a. Plaintiff's claims against Verve do not rely on the Tagged TOS nor are intimately found in and intertwined with it.**

The first prong of that rule allows a nonsignatory to invoke equitable estoppel to enforce an arbitration agreement "when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract." *Kramer*, 705 F.3d at 1128–29 (quotations omitted). "These circumstances are limited." *Ballesteros*, 109 Cal. App. 5th at 1207. There "must be actual reliance on the terms of the agreement, and the causes of action must premise liability on duties *imposed by the agreement* itself." *Id*. at 1207–08 (quotations and citations omitted) (emphasis in original). The Ninth Circuit has explained that "where allegations reveal . . . there is no claim founded in or even tangentially related to any duty, obligation, term or condition imposed by the [relevant] agreements, the claims are fully viable without reference to the terms of those agreements and equitable estoppel does not apply." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1095 (9th Cir. 2020) (quotations and citations omitted).

Here, Plaintiff does not seek to hold Verve liable for obligations imposed by the Tagged TOS. The duties and obligations that Plaintiff alleges Verve violated arise out of two statutes, CIPA and CDAFA, not from any contractual duties. Plaintiff's claims can absolutely "be evaluated [and] understood . . . without analyzing the data-usage disclosures in the Tagged Privacy Policy." (Def.'s Mot. at 30). All that needs to be evaluated is Verve's data collection practices—which, in fact, are

nowhere to be found in Tagged's TOS or Privacy Policy—and whether they comply with CIPA's pen register statute and CDAFA.

The California Supreme Court's recent decision in *Ford Motor Warranty Cases*, 17 Cal. 5th 1122 (2025), addresses the distinction between claims that arise from statute versus contract. There, the Court rejected nonsignatory enforcement of an arbitration clause where the alleged obligations "appear nowhere in the [relevant] contracts" and instead "derive[] from statutory mandates." *Id.* at 1136. Like Ford's warranty liability that arose from "a statutory scheme separate and apart from the contracts," *id.* at 1133, Verve's alleged CIPA and CDAFA violations stem from California Penal Code sections 638.51 and 502—statutory privacy protections that exist independent of Tagged's TOS and Privacy Policy (to which Verve is not even a party). Just as Ford could not enforce dealer arbitration agreements for statutory warranty claims, Verve cannot enforce Tagged's arbitration agreement for statutory privacy violations. At bottom, Plaintiff's claims "are fully viable without reference to" the Tagged TOS, *Namisnak*, 971 F.3d at 1095 (quoting *Goldman*, 173 Cal. App. 4th at 229), and "arise from a statutory scheme separate and apart from the [Tagged] contract," *Ford*, 17 Cal. 5th at 1133.

Verve argues that Plaintiff's claims "cannot be evaluated without interpreting the contract between Tagged and Plaintiff," under which they claim Plaintiff consented to Verve's surreptitious data collection. (Def.'s Mot. at 29.) But "the equitable estoppel doctrine looks at whether a Plaintiff's claims rely on an underlying agreement, not whether a party's defense relies on such an agreement." *Faucett v. Move, Inc.*, No. 22-cv-04948-ODW (ASX), 2024 WL 2106727, at *6 (C.D. Cal. Apr. 22, 2024), *aff'd* No. 24-2631, 2025 WL 1112935 (9th Cir. Apr. 15, 2025) (citing *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1230 (9th Cir. 2013)). And consent is an affirmative defense to all of Plaintiff's claims. *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 619 (N.D. Cal. 2021); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1048 (S.D. Cal. 2023). As explained above, Plaintiff's claims rely on two state statutes, not the Tagged TOS. Thus, because only Verve's consent defense—not Plaintiff's claims—rely on the Tagged TOS, equitable estoppel does not apply. *Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir. 2018) (reversing district court's granting of

nonsignatory's motion to compel arbitration because "although [nonsignatory's] affirmative defense of express consent may require the district court to analyze the Wireless Agreement, [plaintiff's] *claims* do not rely on the terms of the Wireless Agreement") (quotations omitted) (emphasis in original); *Faucett*, 2024 WL 2106727, at *5–6 (refusing to apply equitable estoppel where plaintiff's claims were based on federal statute, even though nonsignatory asserted consent defense based on contract containing arbitration clause); *Wiedenbeck v. United Educ. Inst.*, No. SACV 15-00810-CJC, 2015 WL 12743599, at *4–5 (C.D. Cal. Dec. 15, 2015).

Plaintiff does not allege substantially interdependent and concerted misconduct by Verve and Tagged. Nor does the second prong of the arbitration-specific equitable estoppel test help Verve. That prong allows a nonsignatory to enforce an arbitration agreement "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Kramer*, 705 F.3d at 1128–29 (quotation omitted). In keeping with this prong, Verve argues that "the core theory of Plaintiff's case is that Tagged allegedly colluded with VGE to secretly collect and use Tagged users' information for their mutual profit." (Def.'s Mot. at 32.) But that's not correct. Plaintiff's core theory is that Verve integrated its SDK into over five thousand mobile apps, not just Tagged, to surreptitiously collect sensitive data from consumers and create digital dossiers on them to support its business model. (FAC ¶¶ 13–42.) The only reason that anyone is talking about Tagged here is because Tagged happens to be one of the Verve-SDK-containing apps used by Plaintiff. Plaintiff would have the exact same claims against Verve if he had used any of the other approximately 4,999 apps into which Verve's SDK was integrated. (Indeed, Plaintiff is seeking to represent a class composed of users of all those other apps.) (*Id.* ¶ 46.)

Those are not allegations of substantially interdependent and concerted misconduct. In *Houghton v. Leshner*, for example, a cryptocurrency creator sued for securities violations tried to invoke equitable estoppel to enforce an arbitration agreement between plaintiffs and the trading platform on which plaintiffs had purchased defendant's cryptocurrency. The court held that the

defendant and the trading platform did not engage in substantially interdependent and concerted misconduct—and thus, equitable estoppel did not apply—because "plaintiffs could have purchased [defendant's cryptocurrency] on any exchange and . . . alleged the exact same claim against [defendant]." 2024 WL 5154071, at *6. The same applies to this case. Moreover, Plaintiff isn't alleging substantially interdependent and concerted misconduct between Verve and Tagged because he isn't alleging *any* misconduct by Tagged. *See Wiedenbeck*, 2015 WL 12743599, at *5 (no equitable estoppel where "[plaintiff] is not alleging any misconduct whatsoever against [signatory], let alone alleging 'interdependent misconduct' concerning [signatory] and [defendant nonsignatory]"); *Mance v. Mercedes-Benz USA*, 901 F. Supp. 2d 1147, 1157 (N.D. Cal. 2012) (interdependent and concerted misconduct prong of equitable estoppel does not apply where plaintiff "does not bring any claims against [signatory]").

Verve's cited cases are inapposite. *Hunt v. Meta Platforms* explicitly declined to find "concerted misconduct" by a nonsignatory that was "closely enough connected" to the signatory's agreement. 735 F. Supp. 3d 1133, 1138 (N.D. Cal. 2024). Verve's other cases illustrate why Verve and Tagged *didn't* engage in interdependent misconduct. In *Coinmint, LLC v. DX Corr Design, Inc.*, for example, the signatory and nonsignatory defendants engaged in "a single scheme to achieve a single aim" and "a concerted effort" to fraudulently induce the plaintiff's assent to a purchasing agreement. No. 23-cv-00599-RS, 2023 WL 9595893, at *4. *Sanders v. Swift Transp. Co. of Ariz.* involved signatory and nonsignatory defendants that engaged "jointly in furtherance of a common scheme" to violate California labor laws. 843 F. Supp. 2d 1033, 1038 (N.D. Cal. 2012). And in *Salas v. Universal Credit Servs.*, the court found interdependent misconduct when the signatory and nonsignatory defendants engaged in the same common action of "procur[ing] Plaintiff's credit report and pass[ing] it from one Defendant to the next." No. 17-cv-2352 JLS, 2019 WL 1242448, at *4 (S.D. Cal Mar. 18, 2019). By contrast, Woods does not allege that Tagged and Verve conspired together, executed any joint scheme, or engaged in any common action. Verve independently compiled Woods's precise geolocation data, created his dossier, and sold it to third parties. In fact, Plaintiff alleges that Verve's SDK is a direct collection tool embedded within Tagged—*not* that

Tagged is an intermediary that collects and transmits data to Verve. (FAC ¶ 2) ("VGE developed and disseminated a software development kit ('SDK') that enables backdoor access to consumers' devices and opens a direct data collection pipeline to Verve and its advertising platform monetization partners."); (*see also id.* ¶¶ 14, 17, 44).

**D. Tagged's Arbitration Agreement and Delegation Clause are Unconscionable.**

Even if Verve could invoke the Tagged arbitration agreement as a nonsignatory, the agreement is unconscionable. "[U]nconscionability is a generally applicable contract defense that may render an agreement to arbitrate unenforceable." *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1092 (9th Cir. 2009).

"Unconscionability has both a procedural and a substantive element." *Pandolfi v. Aviagames, Inc.*, No. 24-5817, 2025 WL 2463742, at *1 (9th Cir. Aug. 27, 2025) (citing *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 491 (2024)). Procedural unconscionability focuses "on oppression or surprise due to unequal bargaining power" at the time of "contract negotiation and formation." *Id.* at 492. (citation modified). On the other hand, substantive unconscionability "considers the fairness of an agreement's actual terms, focusing on whether the contract will create unfair or one-sided results." *Id*. at 493. Both procedural and substantive elements are needed for unconscionability, but they need not "be present to the same degree." *Id*. Rather, a sliding scale is used where "the more substantively oppressive a term, the less evidence of procedural unconscionability is required" and vice versa. *Id*.

A small wrinkle in the analysis arises because the Tagged TOS delegates enforceability questions to the arbitrator. Thus, before assessing the unconscionability of the Tagged arbitration agreement, this Court must first look to whether the delegation clause itself is unconscionable. *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680 (9th Cir. 2024). In doing so, however, the Court's assessment of the delegation clause "is not limited to the bare text of the clause." *Id*. In evaluating an unconscionability challenge to a delegation clause, "a court must be able to interpret the provision in the context of the agreement as a whole, which may require examining the underlying arbitration agreement as well." *Id*. at 681 (quotation omitted). "If a court cannot look

through the delegation provision to the rest of the contract, a court would fail to see how delegating questions of arbitrability to an arbitrator was unconscionable." *Id*. (quotation omitted).

Both the delegation clause and the arbitration provision itself are unconscionable here.

**1. The delegation clause is procedurally unconscionable.**

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion, defined as a standardized contract, imposed upon the subscribing party' by the party with superior bargaining strength 'without an opportunity to negotiate terms.'" *Ireland-Gordy v. Tile, Inc.*, 760 F. Supp. 3d 946, 961 (N.D. Cal. 2024) (quoting *Heckman*, 120 F.4th at 681). Here, it cannot be disputed that the Tagged TOS is such a standardized contract, imposed upon Plaintiff by Tagged without an opportunity to negotiate terms (such as the delegation clause). "Because the [delegation clause] is part of a contract of adhesion, it is therefore at least procedurally unconscionable to a low degree, even assuming no other oppression or surprise exists beyond that inherent to any adhesion contract." *Id*.; *see also Heckman*, 120 F.4th at 681 ("Some California courts have held that in itself a finding of a contract of adhesion is essentially a finding of procedural unconscionability.") (quotations and citations omitted).

Beyond the adhesive nature of the Tagged TOS, "surprise" is also a factor in procedural unconscionability. *Heckman*, 120 F.4th at 681–82. And delegation clause "carries a modest degree of procedural unconscionability [when] it is hidden in the Terms of Service." *Pandolfi*, 2025 WL 2463742, at *1, (citing *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1001 (9th Cir. 2021) (finding "some degree of procedural unconscionability" when the delegation clause was buried in a 31-page terms of service). Tagged's delegation clause is a nondescript sentence buried in the middle of its lengthy TOS. Additionally, "a layperson would be surprised to find that the delegation clause is subject to the batching provision." *See Pandolfi*, 2025 WL 2463742, at *1 (citing *OTO, L.L.C. v. Kho*, 447 P.3d 680, 691-92 (Cal. 2019)). These elements of surprise increase the agreement's procedural unconscionability.

The agreement also incorporates American Arbitration Association ("AAA") rules by reference—rules that AAA can unilaterally modify at any time. The Ninth Circuit has explained that

such a practice carries a degree of procedural unconscionability. *See Pandolfi*, 2025 WL 2463742, at *1) (*citing Heckman*, 120 F.4th at 678). Additionally, Tagged reserves the right to unilaterally modify its TOS at any time,[9] with continued use constituting acceptance of the changes. As *Heckman* explained, this type of unilateral modification provision is "particularly disadvantageous to consumers" because users must return to the app to access their accounts and existing connections, making it "nearly impossible to avoid retroactive application of any changes" Tagged imposes. 120 F.4th at 678.

**2. The delegation clause is substantively unconscionable.**

To start, the broad scope of the delegation clause as applied here is substantively unconscionable. "[I]t would be overly harsh, unduly oppressive, or unfairly one-sided to enforce an arbitration provision in [Woods's] consumer contract as applying to claims about [Verve's] use of [Tagged's] products or services to stalk [Woods]." *Ireland-Gordy*, 760 F. Supp. 3d at 960 (quotation omitted). Verve argues that the scope of the Tagged arbitration agreement is broad enough to cover Woods's claims against it for surreptitiously collecting sensitive personal information about him in violation of state privacy statutes. (Def.'s Mot. at 27.) But "there is a high degree of substantive unconscionability to the extent the arbitration agreement purportedly encompasses claims relating to third-party conduct using [Tagged's] products or services for stalking." *Ireland-Gordy*, 760 F. Supp. 3d at 960 .

Additionally, the arbitration agreement provides that, due to need for the arbitrator to resolve disputes regarding whether the Mass Filing provisions apply, "adjudication of the dispute may be delayed." (Def.'s Mot. Ex. D. at 6). The Mass Filing terms require bellwether arbitrations followed by mandatory mediation. *Id*. Only after such proceedings would the remaining non-bellwether claims proceed *in court*. *Id*. Hence, the Mass Filing terms delay the case and purport to provide

[9] "We reserve the right to modify this Policy at any time, so please review it frequently. If we make material changes to this Policy, we will notify you here by updating the effective date, or by other means, such as e-mail, at our discretion. We recommend that you review this Policy from time to time to stay informed of our practices. Your continued use of any portion of our Services following the posting of the updated Policy will constitute your acceptance of the changes." (Def.'s Mot. Ex. H at 11)

Tagged—and Verve by extension—with a free preview of what claims are likely worth and an opportunity to settle globally or to proceed back to court. This is "substantively unconscionable because it could create lengthy delays to resolve a gateway issue," and "those delays could have a chilling effect on players bringing claims to begin with." *Pandolfi*, 2025 WL 2463742, at *1.

**3. The arbitration agreement more generally is procedurally and substantively unconscionable.**

The elements of the Tagged TOS that make the delegation clause unconscionable—their adhesive nature, the unilateral modification provision, the arbitration agreement's broad scope covering third-party misconduct, the Mass Filings and delays provisions—also serve to make the arbitration agreement both procedurally and substantively unconscionable. *See Heckman*, 120 F.4th at 688 (holding arbitration agreement unconscionable for same reasons as delegation provision).

California law grants broad leeway to trial courts to remedy unconscionable contracts: they may refuse to enforce the contract, sever an unconscionable clause and enforce the remainder of the contract, or limit the application of an unconscionable clause to avoid an unconscionable result. *Id*. (citing Cal. Civ. Code § 1670.5(a)). Given the number and breadth of unconscionable provisions here, this Court need not attempt to sever them from the Tagged TOS; it should simply hold the entire arbitration agreement unenforceable. *See*, *e.g.*, *id*. at 688–89 (holding district court did not abuse its discretion in declining to sever offending provisions where "unconscionability permeates all aspects of the arbitration agreement"); *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1099–104 (9th Cir. 2024) (affirming district court's refusal to sever unconscionable terms from arbitration agreement where "the procedural unconscionability is at least moderate, and the agreement contains at least two substantively unconscionable provisions"); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1045–46 (N.D. Cal. 2022) (refusing to sever where existence of multiple unconscionable provisions "suggested that the party in the superior bargaining position was trying to impose arbitration not as an alternative to litigation but rather as an inferior forum").

The fact that the Tagged TOS contains a severability clause, (Def.'s Mot. Ex. D) does not affect the analysis. *See MacClelland*, 609 F. Supp. 3d at 1045 ("The existence of the severability

clauses does not change the fact that where an agreement is permeated by unconscionability, a court will not sever the unlawful provisions."); *Heckman*, 120 F.4th at 688–89 (affirming district court's refusal to sever despite existence of severability clause); *Ronderos*, 114 F.4th at 1103 (same, noting that "California courts have frequently held that a trial court did not abuse its discretion in declining to sever unconscionable provisions, even though the agreement contained a severability clause"). Indeed, "[i]f the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court." *MacClelland*, 609 F. Supp. 3d at 1046 (citation omitted); *Heckman*, 120 F.4th at 688 (quoting *MacClelland*).

## CONCLUSION

Verve's Motions should be denied. Woods sufficiently pleads Article III standing and the elements of his CIPA and CDAFA claims. Likewise, the Court should refuse to compel arbitration under equitable estoppel or any other theory. The agreement does not cover claims involving Verve, and both the delegation clause and the arbitration provision are unconscionable and unenforceable.

Dated: October 3, 2025

Respectfully submitted,

**ALEX WOODS,** individually and on behalf of all others similarly situated,

By: <u>*/s/ Rafey Balabanian*</u>
*One of Plaintiff's Attorneys*

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

**Pro hac vice admission to be sought*

*Counsel for Plaintiff and the Putative Class*